IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| ANTHONY SLAMA, | ) | 1:08-cv-810 AWI GSA |
| | ) | |
| Plaintiff, | ) | ORDER ON DEFENDANTS' |
| v. | ) | MOTION FOR SUMMARY |
| | ) | JUDGMENT |
| CITY OF MADERA, MADERA | ) | |
| POLICE DEPT., OFFICER CHAVEZ, | ) | |
| OFFICER SHEKIANIAN, and DOES | ) | |
| 1 through 100, | ) | (Doc. No. 53, 57, 108) |
| | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

    This case stems from the arrest of pro se Plaintiff Anthony Slama ("Slama") by Madera Police Officers Josh Chavez ("Chavez") and Shant Sheklanian ("Sheklanian")[1] for violation of California Penal Code § 148(a)(1). Slama has brought suit in this Court under 42 U.S. C. § 1983 and alleges four violations of the Fourth Amendment against the City of Madera ("the City"), Chavez, and Sheklanian. The Court previously granted two summary judgment motions in favor of Defendants, and closed the case. However, on September 12, 2011, the Court granted Slama's Rule 60 motion and reopened the case on the grounds that Slama's counsel had essentially abandoned him by not filing oppositions to the summary judgment motions. The Court vacated the two summary judgment orders, permitted Slama to represent himself in this matter, and gave him the opportunity to file an opposition to Defendants' motions. The Court has now received Slama's opposition and Defendants' reply. After considering the initial moving papers, as well as the recent opposition and reply, the Court will grant in part and deny in part Defendants' motions.

---

[1] Sheklanian was erroneously identified as "Shekianian."

# FACTUAL BACKGROUND[2]

On December 20, 2005, around 1:30 a.m., officers Chavez and Sheklanian observed Slama walking on the south side of East Central Avenue and "D" Street around 1:30 a.m.[3]  See DUMF 1; DSUMF's 2, 3; PRDSUMF's 2, 3.  This area is known for drug activity.  See Chavez Depo. 20:20-24.  The officers were in a marked police vehicle.  See DSUMF 4.  The officers shined a spotlight on Slama, turned their vehicle around, and drove their vehicle toward Slama.  See Slama Dec. (Doc. No. 110) at ¶ 17.  Slama was wearing pleated pants, a leather jacket, black dress shoes, and had a red igloo lunch pail strapped around his shoulder.  See Slama Depo. 35:23-.36:25.  Slama was not walking in the shadows when the officers observed him.  See PUMF 1.

The officers exited their vehicle quickly and issued an order for Slama to stop.  See Slama Dec. at ¶ 18.  Slama heard the officers come very quickly/run towards him.  See id. at ¶ 19.  When Slama heard the officers' command to stop, he complied, stopped walking, kept his back to the officers, and did not turn around.  See id. at ¶¶ 20, 21; Slama Depo. 43:12-44:17.

Sheklanian then went to Slama's left side.  See Slama Depo. 44:19-20.  Sheklanian told Slama that he was going to search Slama for weapons, and then immediately grabbed Slama's left wrist.  See id. at 44:22-45:13; Slama Dec. ¶ 22.  Sheklanian did not ask Slama for permission to search his person for weapons, but grabbed Slama's wrist and moved the wrist towards the middle of Slama's back.  See Slama Depo. 44:25-46:1.

Within one or two seconds later, Chavez came to Slama's right side.  See Slama Depo.

---

[2] "DFUMF" refers to Defendants' First Undisputed Material Facts, "DSUMF" refers to Defendants' Second Undisputed Material Facts, and a "PR" in front of either of the previous abbreviations refers to "Plaintiff's Response" to those undisputed facts.  "PUMF" refers to Plaintiffs' Undisputed Material Facts.

Additionally, there are myriad disputes regarding the underlying facts of this case.  As reflected in the Court's prior summary judgment orders, Defendants' version of the facts (in a nutshell) indicate that the initial encounter with Slama was consensual, the course of the encounter led the officer to believe that Slama was secreting contraband, Slama became non-compliant, Slama actively and physically resisted the officers, and the officer were justified in using force against Slama.  See Doc. Nos. 56, 59.  Slama's version of events are completely different.  Because Slama is the non-moving party, the Court must accept his version of events as true for purpose of this summary judgment motion.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Thomas v. Ponder, 611 F.3d 1144, 1149 (9th Cir. 2010).

[3] Defendants contend that Slama was walking in the shadows, see DFUMF 2, but Slama contends that there were no shadows.  See PRDFUMF 1, PUMF 1.  As the non-moving party, the Slama's version of events is credited.  See Thomas, 611 F.3d at 1149.

46:4-6.  Chavez told Slama that he wanted to see Slama's other hand, and then grabbed Slama's right hand.  See id. at 46:7-11.  Slama's right hand was empty and opened when Chavez grabbed it.  See id. at 46:25-47:7.  As Chavez took Slama's right hand, Chavez lunged Slama's hand/arm upward and slightly outward, which caused Slama's body to "jackknife" and forced Slama to go down on his knee.  See id. at 46:20-47:25.  Slama heard Chavez say, "I got him," and then Chavez got on Slama's back and placed a choke hold on Slama.[4]  See id. at 48:6-16; Slama Dec. ¶¶ 24, 26.  Slama began to lose consciousness as a result of the choke hold, and Chavez rolled Slama to the ground.  See id. at 51:1-6, 52:2-4.  Chavez got off Slama's back, and Slama was nearly laying flat on the ground.  See id. 51:9-16.  Slama reached for his neck, and heard one of the officers say "down, down, down," or "get down."  See id.  Slama did not try to get up from the ground.  See id. 53:3-5.  As Slama heard the officers telling him "down," Chavez deployed a taser on Slama.  See id. at 53:1-24.  Slama was on his stomach and the officers did not warn him that they would deploy the taser.  See id.  Slama felt the taser application.  See id. at 53:23-54:6.  Only one taser application was utilized against Slama.  DSUMF 14.

After the taser application, Slama was temporarily incapacitated on his stomach.  See Slama Depo. 53:17-54:6.  Slama was then picked up and placed in the back of the police car without further incident.  See id. at 54:16-56:7.  Slama was arrested for violation of Penal Code § 148(a)(1) – resisting, delaying or obstructing an officer.  DFUMF 1.  During the encounter of December 20, 2005, Slama did not consent to being searched and did not resist the officers.  See Slama Dec. ¶¶ 25, 29; Slama Depo. 44:5-47:17, 52:9-53:22, 99:20-100:20.  The Penal Code § 148(a)(1) charge was subsequently dropped on May 2, 2008.  See DSUMF 16.

The City Police Department has a POST Perishable Skills Program regarding Arrest and Control.  DFUMF 10.  The City has a POST Perishable Skills Program regarding Tactical

---

[4] The officers testified that they saw Slama bring his right hand to his mouth.  See Chavez Depo. 21:12-15; Sheklanian Depo. 31:5-16.  The officers also contend that they told Slama to open his mouth, but Slama refused.  See DFUMF 5.  Slama denies this, and his deposition testimony makes clear that he did not move his hand to his mouth, and the sequence of events as described by Slama does not include a specific request to open his mouth, or provide for enough time for an order for him to open his mouth.  See PRDFUMF 5; Slama Depo. 44:5-51:6, 99:20-100:25.  As the non-moving party, Slama's version will be credited.  See Thomas, 611 F.3d at 1149.  Thus, Slama did not move his hand towards his mouth, he was not asked to open his mouth, and he did not refuse to open his mouth.

3

Firearms. DFUMF 11. The City's police officers receive training on the necessary tactical knowledge and skills to safely and effectively arrest and control a suspect. DFUMF 12. The City Police Department's officers receive training on the necessary firearms tactical knowledge. DFUMF 13. For example, Sheklanian has received at least 158 hours of training. DFUMF 14. This includes 134 hours of POST certified training. Id.

The City Police Department has a Manual which covers Use of Force, Deadly Force Review, Shooting Policy, Leg Restraint Device and Control Devices and Techniques. DFUMF 15. The City Police Department Policy does not contain a policy or procedure that permits the use of excessive force by its officers in violation of the Constitution. DFUMF 16.

## **SUMMARY JUDGMENT STANDARD**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Fortyune v. American Multi-Cinema, Inc., 364 F.3d 1075, 1080 (9th Cir. 2004). The party seeking summary judgment bears the initial burden of informing the court of the basis for its motion and of identifying the portions of the declarations (if any), pleadings, and discovery that demonstrate an absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007). A fact is "material" if it might affect the outcome of the suit under the governing law. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-49 (1986); Thrifty Oil Co. v. Bank of America Nat'l Trust & Savings Assn, 322 F.3d 1039, 1046 (9th Cir. 2002). A dispute is "genuine" as to a material fact if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party. Anderson, 477 U.S. at 248; Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006).

Where the moving party will have the burden of proof on an issue at trial, the movant must affirmatively demonstrate that no reasonable trier of fact could find other than for the movant. Soremekun, 509 F.3d at 984. Where the non-moving party will have the burden of proof on an issue at trial, the movant may prevail by presenting evidence that negates an essential

element of the non-moving party's claim or by merely pointing out that there is an absence of evidence to support an essential element of the non-moving party's claim. See James River Ins. Co. v. Schenk, P.C., 519 F.3d 917, 925 (9th Cir. 2008); Soremekun, 509 F.3d at 984; Nissan Fire & Marine Ins. Co. v. Fritz Cos., 210 F.3d 1099, 1105-06 (9th Cir. 2000). If a moving party fails to carry its burden of production, then "the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion." Nissan Fire & Marine Ins. Co. v. Fritz Companies, 210 F.3d 1099, 1102-03 (9th Cir. 2000). If the moving party meets its initial burden, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Nissan Fire & Marine, 210 F.3d at 1103. The opposing party cannot "'rest upon the mere allegations or denials of [its] pleading' but must instead produce evidence that 'sets forth specific facts showing that there is a genuine issue for trial.'" Estate of Tucker v. Interscope Records, 515 F.3d 1019, 1030 (9th Cir. 2008) (quoting Fed. R. Civ. Pro. 56(e)).

The evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. See Anderson, 477 U.S. at 255; Matsushita, 475 U.S. at 587; Stegall v. Citadel Broad, Inc., 350 F.3d 1061, 1065 (9th Cir. 2003). Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn. See Sanders v. City of Fresno, 551 F.Supp.2d 1149, 1163 (E.D. Cal. 2008); UMG Recordings, Inc. v. Sinnott, 300 F.Supp.2d 993, 997 (E.D. Cal. 2004). "A genuine issue of material fact does not spring into being simply because a litigant claims that one exists or promises to produce admissible evidence at trial." Del Carmen Guadalupe v. Agosto, 299 F.3d 15, 23 (1st Cir. 2002); see Galen v. County of Los Angeles, 477 F.3d 652, 658 (9th Cir. 2007); Bryant v. Adventist Health System/West, 289 F.3d 1162, 1167 (9th Cir. 2002). Further, a "motion for summary judgment may not be defeated . . . by evidence that is 'merely colorable' or 'is not significantly probative.'" Anderson, 477 U.S. at 249-50; Hardage v. CBS Broad. Inc., 427 F.3d 1177, 1183 (9th Cir. 2006). Additionally, the court has the discretion in appropriate

circumstances to consider materials that are not properly brought to its attention, but the court is not required to examine the entire file for evidence establishing a genuine issue of material fact where the evidence is not set forth in the opposing papers with adequate references. See Southern Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 889 (9th Cir. 2003); Carmen v. San Francisco Unified Sch. Dist., 237 F.3d 1026, 1031 (9th Cir. 2001). If the nonmoving party fails to produce evidence sufficient to create a genuine issue of material fact, the moving party is entitled to summary judgment. See Nissan Fire & Marine, 210 F.3d at 1103.

## DEFENDANTS' MOTION

Slama alleges four violations of the Fourth Amendment: (1) detention and arrest without reasonable suspicion or probable cause; (2) excessive force; (3) *Monell* liability for failure to train; and (4) *Monell* liability for a custom or policy that permits excessive force. The Court will address the causes of action separately.

### 1. First Cause of Action – Arrest Without Probable Cause

*Defendants' Argument*

Defendants argue that the officers had probable cause under Penal Code § 148(a)(1).[5] Slama was walking in the shadows of a high crime area at 1:30 a.m. When the officer approached, Slama acted very nervous. After receiving permission to search for weapons, the officers noticed that Slama's hand was in a fist and he refused to open it. Slama's hand came towards his mouth. The officers struggled with Slama and Slama did not obey commands. This conduct provided probable cause to arrest.[6]

*Plaintiff's Opposition*

Slama argues that the evidence shows that the officers did not have a basis to legally stop

---

[5] California Penal Code § 148(a)(1) reads:
Every person who willfully resists, delays, or obstructs any public officer, peace officer, or an emergency medical technician . . . in the discharge or attempt to discharge any duty of his or her office or employment, when no other punishment is prescribed, shall be punished by a fine not exceeding one thousand dollars ($1,000), or by imprisonment in a county jail not to exceed one year, or by both that fine and imprisonment.

[6] In the alternative, the officers argue that they are entitled to qualified immunity. The Court will address qualified immunity under a separate section of this order.

6

him, and that he complied with the commands that were given. Slama also argues that he did not consent to any of the conduct by the officers, and did not resist them. Because there was neither a legal basis for the stop nor probable cause to arrest, summary judgment is improper.

*Legal Standard*

"The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." United States v. Arvizu, 534 U.S. 266, 273 (2002); Ramirez v. City of Buena Park, 560 F.3d 1012, 1020-21 (9th Cir. 2009). Under the Fourth Amendment, a "detention or seizure of a person occurs when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." United States v. Orman, 486 F.3d 1170, 1175 (9th Cir. 2007); Desyllas v. Bernstine, 351 F.3d 934, 940 (9th Cir. 2003).

"The Fourth Amendment requires police officers to have probable cause before making a warrantless arrest." Ramirez v. City of Buena Park, 560 F.3d 1012, 1023 (9th Cir. 2009); see Beier v. City of Lewiston, 354 F.3d 1058, 1065 (9th Cir. 2004). "Probable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." Rodis v. City & County of San Francisco, 558 F.3d 964, 969 (9th Cir. 2009); John v. City of El Monte, 515 F.3d 936, 940 (9th Cir. 2008). Courts look to "the totality of the circumstances known to the arresting officers to determine if a prudent person would have concluded there was a fair probability that the defendant had committed a crime." John, 515 F.3d at 940; see Hart v. Parks, 450 F.3d 1059, 1066 (9th Cir. 2006).

For seizures that do not amount to a full arrest, police may "detain or seize an individual for brief, investigatory purposes, provided the officers making the stop have reasonable suspicion that criminal activity may be afoot." United States v. Johnson, 581 F.3d 994, 999 (9th Cir. 2009) see Ramirez, 560 F.3d at 1020. "To determine whether [an investigatory] stop was supported by reasonable suspicion, we consider whether, in light of the totality of the circumstances, the officer had a particularized and objective basis for suspecting the particular person stopped of criminal activity." United States v. Palos-Marquez, 591 F.3d 1272, 1275 (9th Cir. 2010); see

Ramirez, 560 F.3d at 1021. "The reasonable suspicion standard is a less demanding standard than probable cause, and merely requires a minimal level of objective justification." Gallegos v. City of Los Angeles, 308 F.3d 987, 990-991 (9th Cir. 2002); see also Ramirez, 560 F.3d at 1020.

Finally, "not all personal intercourse between policemen and citizens involves 'seizures' of persons." Florida v. Bostick, 501 U.S. 429, 434 (1991); Orman, 486 F.3d at 1175. Voluntary, consensual encounters with the police implicate no constitutionally protected rights. See Desallys, 351 F.3d at 940; United States v. Summers, 268 F.3d 683 (9th Cir. 2001). Further, police officers "do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [or] by putting questions to him if the person is willing to listen." Florida v. Royer, 460 U.S. 491, 497 (1983); Orman, 486 F.3d at 1175. In addition to generally asking questions, police officers may also ask to examine identification and request consent to search. See Mueller v. Mena, 544 U.S. 93, 101 (U.S. 2005); Bostick, 501 U.S. at 434-35; United States v. Washington, 490 F.3d 765, 770 (9th Cir. 2007)   However, the police may "not convey a message that compliance with their requests is required." Bostick, 501 U.S. at 435; Washingon, 490 F.3d at 770.

*Discussion*

In the prior summary judgment order, the Court held that the officers' initial encounter with Slama was a voluntary encounter, that Slama voluntarily consented to be searched, that Slama's behavior created reasonable suspicion, and that Slama's escalating behavior led to probable cause to arrest. See Doc. No. 56. Thus, the Court held that there was no violation of the Fourth Amendment. See id. Now that Slama has presented his own facts, which the Court must accept as true for this motion, a different result is warranted.

Slama was arrested for violation of Penal Code § 148(a)(1), obstructing a police officer. The basis for this charge under the officers' theory appears to be that Slama allegedly failed to open his right hand, refused to open his mouth, did not respond to questions and commands, and physically resisted the officers. See Doc. No. 53-1 at 4-5. However, Slama's facts show that he was walking down the street when he was ordered to stop. Shortly after he obeyed the officers and stopped, the officers took Slama's hands and brought them behind his back, which caused

8

him to go to one knee.  Slama's hands were open, and he did not raise his hand to his mouth.  Slama was then choked to the point of losing/nearly losing consciousness, and then tazed.  The evidence does not indicate that Slama physically resisted the officers or refused to obey commands.  While the officers may have been giving Slama commands, the evidence indicates that the officers did not give Slama any reasonable chance to respond to those commands, but instead quickly applied pressure and control holds, including a choke hold, and then used a taser.  The evidence does not indicate reasonable suspicion or probable cause of any crime, nor does it indicate Slama's consent to the encounter, to the officers' conduct, or to a search.[7]

For the defense, the facts at best show that Slama was walking at 1:30 a.m. in a high crime area.  While this is certainly a relevant fact that is to be considered, an "individual's presence in an area of expected criminal activity, standing alone, is not enough to support a reasonable, particularized suspicion that the person is committing a crime."  Illinois v. Wardlaw, 528 U.S. 119, 124 (2000); United States v. Smith, 633 F.3d 889, 893-94 (9th Cir. 2011).  If Slama had run when he saw the officers, then the officers would have had reasonable suspicion to detain him.  See Smith, 633 F.3d at 893-94.  However, Slama simply kept walking and going about his business, and the officers had no basis to order him to stop, i.e. to seize him.[8]  See id.  Further, there is an indication that, after Chavez applied the choke hold and brought Slama fully to the ground, he told Slama to stay down.  Again, however, the evidence indicates that Slama was not trying to get up, and the officers did not give Slama a reasonable opportunity to comply in light of the disorienting and incapacitating effects of the choke hold.

Viewed in the light most favorable to Slama, the totality of the circumstances do not show that Slama was resisting or obstructing the officers, and the officers did not have reasonable suspicion, probable cause, or consent.  Therefore, summary judgment will be denied.

---

[7] Defendants contend that they approached Slama, asked if they could search him for weapons, and that Slama consented by placing his hands behind his back.  See DSUMF 5, 6.  Slama contends that the officers did not ask for permission, but instead said that they were going to search him and then grabbed his wrists.  See Slama Depo. 44:3-46:24.  Slama also contends that it was the officers who placed his hands behind his back.  See id. at 100:18-20.  For purposes of this motion, Slama's version is credited, and that version shows the absence of consent.

[8] Stopping when a police officer yells "stop" is a submission to authority, and constitutes a seizure under the Fourth Amendment.  See California v. Hodari D., 499 U.S. 621, 626-27 (1991); Smith, 633 F.3d at 892-93.

9

### 2. Second Cause of Action – Excessive Force

*Defendants' Argument*

Defendants argue that Slama's Fourth Amendment rights were not violated. Two forms of force were used against Slama, a leg sweep and a taser. The situation confronting the officers changed when Slama turned around and placed his hands behind his back. Slama was nervous, tense, had clinched fists, and refused orders to open his hands. The officers did not know if Slama had a weapon in his hands. Later, Slama raised his arm to his mouth, and the officers believed that Slama was attempting to hide or discard contraband. Slama refused to spit out what was in his mouth, struggled with the officers, and was able to lift Chavez off the ground. Chavez was unable to keep Slama on the ground, so the taser was deployed. Slama posed an immediate threat to the officers, had been struggling with them, and refused to follow lawful commands. The force was not excessive and was justified under the circumstances.[9]

*Plaintiff's Opposition*

Slama argues that the officers used excessive force against him. Slama argues that the encounter was not consensual, that probable cause did not exist, and that he did not resist the officers. Slama contends that he was handcuffed during the taser application and that the use of force by the officers was unreasonable.

*Legal Standard*

All claims that law enforcement officers used excessive force, either deadly or non-deadly, in the course of an arrest, investigatory stop, or other seizure of a citizen are to be analyzed under the Fourth Amendment and its standard of objective reasonableness. See Graham v. Connor, 490 U.S. 386, 395 (1989); Drummund v. City of Anaheim, 343 F.3d 1052, 1056 (9th Cir. 2003). The pertinent question in an excessive force case is whether the use of force was "objectively reasonable in light of the facts and circumstances confronting [the officers], without regard to their underlying intent or motivation." Graham, 490 U.S. at 397; Blankenhorn v. City of Orange, 485 F.3d 463, 477 (9th Cir. 2007). The analysis of whether a specific use of force was reasonable "requires a careful balancing of the nature and quality of the intrusion on the

---

[9] In the alternative, the officers argue that they are entitled to qualified immunity. The Court will address qualified immunity under a separate section of this order.

individual's Fourth Amendment interests against the countervailing government interests at stake." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis v. City of Las Vegas, 478 F.3d 1048, 1054 (9th Cir. 2007). "We first assess the quantum of force used to arrest [the plaintiff]" and then "measure the governmental interests at stake by evaluating a range of factors." Davis, 478 F.3d at 1054. Factors that are considered in assessing the government interests at stake include, but are not limited to, "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." Graham, 490 U.S. at 396; Blankenhorn, 485 F.3d at 477; Davis, 478 F.3d at 1054. Reasonableness "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396; Drummond, 343 F.3d at 1058. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." Graham, 490 U.S. at 396-97; Drummond, 343 F.3d at 1058. However, when the circumstances show that there is no need for force, any force used is constitutionally unreasonable. See Fontana v. Haskin, 262 F.3d 871, 880 (9th Cir. 2001); see also Motley v. Parks, 432 F.3d 1072, 1089 (9th Cir. 2005).

*Discussion*

In the prior summary judgment order, the Court held that there were only two applications of force at issue, a leg sweep and a taser application. See Doc. No. 59. The Court granted summary judgment to Sheklanian because he did not perform those acts. See id. The Court held that the leg sweep was reasonable because Slama was acting nervous, his body had tensed, he had a clenched fist, and he would not open the fist despite commands to do so. See id. Also, the Court granted Chavez qualified immunity for the taser application and closed the case. Now, after having reviewed Slama's opposition, the Court concludes that a different result is proper.

In terms of the force that was used against Slama, the force described would range from minor quantums of force to significant (though non-lethal) quantums. The evidence shows that Slama's wrists were grabbed and elevated to the point that he was brought to his knees, he was

11

1  choked, and he was tasered, see Slama Depo. 44:22-48:16; DSUMF 14, and, while Slama cannot
2  recall whether there was a leg sweep, see Slama Depo. 50:12-16, Chavez indicates that he
3  attempted to perform a leg sweep on Slama.  See Chavez Depo. 21:5-21.

4       The evidence does not indicate that any crime was at issue.  As discussed above, at most
5  the officers only could point to a well dressed man who was walking in a high crime area in the
6  early morning hours.  Those facts do not implicate any crime.

7       The evidence does not indicate that Slama was fleeing or evading arrest, and at no time
8  did he appear to pose an imminent risk to the officers or to others.  When the wrist controls were
9  utilized, Slama had said nothing and was merely standing still.  When the leg sweep was
10 attempted and the choke hold utilized, Slama had gone to one knee already as the result of the
11 wrist control.  The evidence does not indicate that Slama made any aggressive moves towards the
12 officers, and since his hands were open, there was no fist for him to unclench.  Finally, when the
13 taser was utilized, Slama was on the ground and suffering the effects of the choke hold.  An eye
14 witness, Louie Vela, testified that Slama was on his stomach and handcuffed when the taser was
15 deployed.  See Vela Depo. 26:14-20.  Vela testifed that Slama was not keeping still when the
16 taser was used, but that Slama was merely moving and not attempting to get up.  See id. at 26:18-
17 27:18.  Moving around, but not trying to get up following being handcuffed and choked, does not
18 indicate active resistance or an imminent threat.

19       In light of these considerations, and irrespective of the actual quantum of the various
20 types of force, the evidence when viewed in the light most favorable to Slama indicates that no
21 amount of force was justified.  See Fontana, 260 F.3d at 880.

22       Because Chavez performed a wrist control, attempted the leg sweep, performed a choke
23 hold, and used the taser, Chavez's motion for summary judgment on this cause of action will be
24 denied.  However, the evidence indicates that Sheklanian only performed a wrist control on
25 Slama.  Therefore, the Court will deny Sheklanian's summary judgment motion with respect to
26 the wrist control, but will grant Sheklanian's summary judgment motion with respect to the
27 attempted leg sweep, choke hold, and taser application.  See KRL v. Moore, 384 F.3d 1105, 1118
28 (9th Cir. 2004); Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989).

**3.     First & Second Causes of Action – Qualified Immunity**

*Legal Standard*

A court employs a tiered analysis for determining qualified immunity. See Saucier v. Katz, 533 U.S. 194, 200-02 (2001); Skoog v. County of Clackamas, 469 F.3d 1221, 1229 (9th Cir. 2006); Brittain, 451 F.3d at 987. However, lower courts need not strictly follow the tiered sequence in analyzing qualified immunity, but instead may dispose of the issue at step two without addressing step one. Pearson v. Callahan, 129 S.Ct. 808, 821 (2009); Moss v. United States Secret Service, 572 F.3d 962, 968 n.5 (9th Cir. 2009). Under the first step, the court determines whether, "taken in the light most favorable to the party asserting the injury, do the facts show the officer's conduct violated a constitutional right?" Saucier, 533 U.S. at 201; Phillips, 477 F.3d at 1079; Skoog, 469 F.3d at 1229. If the answer is "no," then the inquiry ends and the plaintiff cannot prevail; if the answer is "yes," the court continues the analysis. See Saucier, 533 U.S. at 201; Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007); Johnson v. County of L.A., 340 F.3d 787, 793-94 (9th Cir. 2003). Under the second step, the court determines "whether the right was clearly established," and applies an "objective but fact-specific inquiry." Inouye v. Kemna, 504 F.3d 705, 712 (9th Cir. 2007); see Saucier, 533 U.S. at 202; Brittain, 451 F.3d at 988. The critical question is whether "the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates the right." Saucier, 533 U.S. at 202; Phillips, 477 F.3d at 1079. Whether a right is clearly established must be "undertaken in light of the specific context of the case, not as a broad general proposition." Saucier, 533 U.S. at 201; Skoog, 469 F.3d at 1229-30. If the officer could have reasonably, but mistakenly, believed that his conduct did not violate a clearly established constitutional right, then the officer will receive qualified immunity. See Saucier, 533 U.S. at 205-06; Skoog, 469 F.3d at 1229; Johnson, 340 F.3d at 794; Jackson v. City of Bremerton, 268 F.3d 646, 651 (9th Cir. 2001).

*Discussion*

The Court granted qualified immunity to Chavez for his use of the taser because, in addition to the facts associated with the leg sweep, Slama was actively and physically resisting

13

the officers and the state of the law regarding taser use in 2005 was unclear.  See Doc. No. 59.  The Court did not previously discuss qualified immunity with respect to the first cause of action.  Like the previous analyses, now that the Court has received Slama's opposition, a different result with respect to immunity is appropriate.

Viewed in the light most favorable to Slama, the evidence shows that Slama was simply walking down the street when officers ordered him to stop.  Prior to 2005, it was clear that being in a high crime area alone is insufficient to justify an investigatory *Terry* stop.  See Wardlaw, 528 U.S. at 124; see also Smith, 633 F.3d at 893-94.  Slama submitted to the order to stop, was simultaneously told that the officers wanted to search him and, then placed in wrist control holds.  After Slama went down to one knee as a result of the wrist controls, he was choked, handcuffed, and tasered.  No crimes were at issue, Slama was not resisting, he did not consent to any searches, and he posed no threat to the officers.  As stated above, simply moving while handcuffed and while suffering the effects of a choke hold does not constitute resistance or an imminent threat.  No amount of force was justified.  See Fontana, 260 F.3d at 880.

Under these facts, no reasonable officer could conclude that the seizure of, and the force used against, Slama were reasonable.  See Saucier, 533 U.S. at 200-06; Wardlaw, 528 U.S. at 124; Fontana, 260 F.3d at 880.  Qualified immunity will be denied.

### 4.     **Third & Fourth Causes of Action –** *Monell* **Liability**

*Defendant's Argument*

The City argues that Slama has conducted no discovery regarding the policies and procedures of the City's Police Department.  The City's policies (as submitted as part of the motion) do not permit excessive force.  There is no evidence that suggests a systemwide failure to train.  There are no customs or policies that amount to deliberate indifference.  There is simply no evidence that the City fails to train or promotes excessive force.

*Plaintiff's Opposition*

Slama argues that this case is part of pattern that shows the City is not training is officers properly on searches and seizures.  Cases like *Moore v. City of Madera*, 1:07-CV-1493 OWW

DLB and *Torres v. City of Madera*, 648 F.3d 1119 (9th Cir. 2011) reflect a deficiency in the City's training. Further, there is nothing in the City training policies regarding the difference between a consensual encounter and a seizure.

*Legal Standard*

Although municipalities are considered "persons under 42 U.S.C. § 1983, a municipality "cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under [42 U.S.C. § 1983] under a *respondeat superior* theory." Monell v. Department of Soc. Servs., 436 U.S. 658, 690-91 (1978); see Long v. County of Los Angeles, 442 F.3d 1178, 1185 (9th Cir. 2006);. Liability only attaches where the municipality itself causes the constitutional violation through "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy." Monell, 436 U.S. at 694; Ulrich v. City & County of San Francisco, 308 F.3d 968, 984 (9th Cir. 2002). A municipality's failure to train its employees may create § 1983 liability where the "failure to train amounts to deliberate indifference to the rights of persons with whom the [employees] come into contact." City of Canton v. Harris, 489 U.S. 378, 388 (1989); Long, 442 F.3d at 1186; Lee v. City of Los Angeles, 250 F.3d 668, 681 (9th Cir. 2001). "The issue is whether the training program is adequate and, if it is not, whether such inadequate training can justifiably be said to represent municipal policy." Long, 442 F.3d at 1186. A plaintiff alleging a failure to train claim police officers must show: (1) he was deprived of a constitutional right, (2) the municipality had a training policy that "amounts to deliberate indifference to the [constitutional] rights of the persons' with whom [its police officers] are likely to come into contact;" and (3) his constitutional injury would have been avoided had the municipality properly trained those officers. Blankenhorn v. City of Orange, 485 F.3d 463, 484 (9th Cir. 2007). However, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the [municipality] liable." City of Canton, 489 U.S. at 391. "Mere proof of a single incident of errant behavior is a clearly insufficient basis for imposing liability on the County." Merritt v. County of Los Angeles, 875 F.2d 765, 770 (9th Cir. 1989); see McDade v. West, 223 F.3d 1135, 1141 (9th Cir. 2000).

*Discussion*

The undisputed evidence is that the City has policies regarding excessive force, provides training regarding the use of force, provides training regarding the arrest and control of suspects, and does not have a policy that permits the use of excessive force. See DUMF's 10-16. Without a policy or custom, there is no liability against the City. See Monell, 436 U.S. at 694. Further, Slama's assertion that the City does not train its officers regarding consensual encounters is merely an assertion that has no factual support; as such, it is insufficient to defeat summary judgment. See Angel v. Seattle-First Nat'l Bank, 653 F.2d 1293, 1299 (9th Cir. 1982); British Airways Bd. v. Boeing Co., 585 F.2d 946, 951-52 (9th Cir. 1978).

Slama has identified two excessive force cases, *Moore* and *Torres*, which involved either the City or Sheklanian, and contends that these cases show that the City has a policy of tolerating excessive force. However, the Court addressed *Moore* and *Torres*, along with two other cases, in connection with Slama's Rule 56(d) motion. In that order, the Court explained:

> Initially, the issue in *Torres* was excessive force based on the use of a firearm. See Torres, 534 F.3d at 1120. Because no firearm was used in Slama's case, *Torres* is not helpful.
>
> As for the additional three cases, . . . in *James v. City of Madera*, 1:08-CV-1943 OWW GSA, the jury found that the Defendants did not violate the plaintiff's constitutional rights. See Docket in 1:08-CV-1943 OWW GSA at Doc. Nos. 133, 136. Because the constitution was not violated in *James*, this case does not aid Slama in any way. In *Clarke v. City of Madera*, 1:09-CV-1301 LJO DLB, the excessive force claim was barred by the *Heck v. Humphrey* doctrine, meaning that Clarke's conviction was premised on a lawful use of force, and a judgment in Clarke's favor would impermissibly undermine Clarke's conviction. See Docket in 1:09-CV-1301 LJO DLB at Doc. No. 41. Shortly after making the *Heck* ruling, the court dismissed the *Clarke* case due to the plaintiff's failure to prosecute and obey court orders. See id. at Doc. No. 44. Thus, *Clarke* does not demonstrate viable Fourth Amendment claims. Finally, in *Moore v. City of Madera*, 1:07-CV-1493 OWW DLB, the allegation against Sheklanian was excessive force, and that case terminated dsue to settlement. See Docket in 1:07-CV-1493 at Doc. No. 37. The events in *Moore* occurred in January 2007. See id. at Doc. No. 15. The events of this case took place in December 2005. Admittedly the circumstances in *Moore* are similar to the case at bar. Nevertheless, two incidents are insufficient to establish a custom or practice for purposes of *Monell* liability. See Trevino v. Gates, 99 F.3d 911, 918 (9th Cir. 1996); Meehan v. County of Los Angeles, 856 F.2d 102, 106-07 (9th Cir. 1988); Bradford v. City of Seattle, 557 F.Supp.2d 1189, 1203 (W.D. Wash. 2008).

See Doc. No. 95. Since Slama has presented no additional evidence or argument, this analysis continues to hold true.

Slama has identified no policy or procedure, has not shown how the policy or procedure is defective, has not shown how training is defective, has not shown that the City fails to train on a particular subject, and has not shown any conduct that amounts to deliberate indifference. At most, the evidence shows isolated occurrences, which are insufficient. See McSherry v. City of Long Beach, 584 F.3d 1129, 1147 (9th Cir. 2009); McDade, 223 F.3d at 1141; Trevino, 99 F.3d at 918; Merritt, 875 F.2d at 770; Meehan, 856 F.2d at 106-07; Bradford, 557 F.Supp.2d at 1203. Summary judgment on the third and fourth causes of action is appropriate.[10] See id.

## CONCLUSION

Defendants move for summary judgment on all four claims alleged in the complaint.

As to the first cause of action, the evidence indicates that the initial encounter with Slama was not consensual, and neither reasonable suspicion nor probable cause ever existed or developed during the encounter. Thus, summary judgment on this claim will be denied.

As to the second cause of action, the evidence indicates that the officers: acted very quickly, did not give Slama a reasonable opportunity to comply with requests (other than to "stop" walking), and applied wrist controls, a possible leg sweep, a choke hold, and a taser application all in the absence of consent, resistance, or imminent danger. Because he performed each act of force at issue, Chavez's motion for summary judgment will be denied. However, because Sheklanian did not attempt the leg sweep, apply a choke hold, or use a taser against Slama, summary judgment on Slama's second cause of action will be granted in favor of Sheklanian with respect to those actions, but denied with respect to the wrist controls.

As for qualified immunity for the first and second causes of action, the facts as alleged by

---

[10] Slama also argues that the Court denied him additional discovery even though the Court vacated the prior summary judgment motions on the basis of gross negligence by Slama's former attorney. However, the basis for vacating the prior summary judgment motions was Slama's counsel's failure to file oppositions; it was not that Slama's counsel did not engage in discovery. Further, as the Court previously stated, a litigant is generally bound by the conduct of his attorney. Slama's counsel engaged in discovery, and participated in some manner in at least four depositions. That Slama is not pleased with all of the discovery that occurred, or did not occur, does not matter. Contrary to what Slama appears to believe, the vacation of the prior summary judgment motions and the reopening of this case does not mean that the case begins entirely anew or that Slama gets "a do over" on every aspect of the case that preceded summary judgment. That is not how the law functions. Discovery occurred, Slama (through his attorney) participated in that discovery, and discovery is now closed. There is no basis for additional discovery to occur, irrespective of Slama's dissatisfaction with his counsel's performance.

Slama are such that a reasonable officer would know that the conduct at issue was unlawful.[11]

As for the third and fourth causes of action, Slama identifies no improper policies, practices, procedures, or defective training, and does not show that the City acted with deliberate indifference. The evidence shows that the City has policies and conducts training regarding excessive force and arresting and controlling a suspect. Summary judgment on these causes of action is appropriate.

Accordingly, IT IS HEREBY ORDERED that:

1. Defendants' motion for summary judgment on Plaintiff's third and fourth causes of action is GRANTED;
2. Defendants' motion for summary judgment on Plaintiff's first cause of action is DENIED;
3. Defendant Chavez's motion for summary judgment on the second cause of action is DENIED;
4. Defendant Sheklanian's motion for summary judgment on the second cause of action is DENIED with respect to conduct relating to "wrist controls," but is GRANTED with respect to leg sweeps, choke holds, and tasers;
5. The parties shall contact the Magistrate Judge within 30 days of service of this order for the purpose of setting a pre-trial conference date and a trial date; and
6. The Clerk of the Court shall CHANGE the docket so that Defendant "Shant Shekianian" is correctly identified as Defendant "Shant Sheklanian."

IT IS SO ORDERED.

Dated:   June 25, 2012

CHIEF UNITED STATES DISTRICT JUDGE

---

[11] After reviewing Slama's opposition, and in particular his deposition transcript, the Court is surprised and dismayed that Defendants moved for summary judgment on the first two causes of action. Slama's deposition shows direct and express contradiction of many key, material facts. Despite the contradictions, and the clearly established law that requires the Court to accept the non-moving party's position as true, Defendants filed the summary judgment motions. Defendants' conduct set in motion a chain of events that has caused this Court to expend its scarce resources to resolve these summary judgment motions twice, a Rule 60 motion, and a Rule 59(d) motion. With respect to the first two causes of action, the Court has considered whether to issue an order to show cause why sanctions should not be imposed. However, the Defendants' current counsel did not file the offending motions, and the Court wishes this case to progress. The Court warns Defendants that it expects compliance with Rule 11(b) in all future filings, or else sanctions will be imposed through either Rule 11 or the Court's inherent authority.